461 A.2d 616

**COMMONWEALTH of Pennsylvania, Appellant,**

**v.**

**Robert E. HINKSON, I.**

Superior Court of Pennsylvania.

Argued June 16, 1982.

Filed April 29, 1983.

Reargument Denied July 11, 1983.

Petition for Allowance of Appeal Denied Jan. 20, 1984.

Charles S. Hersh, Assistant District Attorney, Hermitage, for Commonwealth, appellant.

Charles F. Gilchrest, Sharon, for appellee.

Before BROSKY, JOHNSON and MONTGOMERY, JJ.

BROSKY, Judge:

█ This is an appeal from the order of the lower court granting in part appellee's motions to suppress physical

evidence and certain statements on the basis of its finding of an unlawful warrantless search.[1] Appellant, the Commonwealth, contends that the search was lawful in that consent to search was given and because exigent circumstances were present. We agree that exigent circumstances existed and reverse the order of the court below.[2]

On July 12, 1981, at about 12:40 a.m., Troopers James Dibler and John Balaska of the Pennsylvania State Police were on patrol when they received a radio message directing them to go to the Campbell residence concerning a shooting incident. The officers drove to that residence, arriving there at about 1 a.m.

There, they spoke with two witnesses, Dale and Brad McFarland, who told the officers they had been at the scene of a recent shooting. The witnesses told the troopers that earlier that evening, they had been riding in a truck driven by Brian McFarland and occupied by two other passengers. They stated that just as the truck passed appellee's residence, the driver was shot in the shoulder by a rifle. This occurred at about 12:20 a.m. The witnesses told the troopers that the victim had already been taken to the hospital. The officers also learned from the witnesses that appellee had a reputation for violence toward passing motorists (e.g., shooting at snowmobiles, threatening motorcyclists with an axe, and swinging a snowplow at a snowmobile). This information was corroborated by a local police officer who arrived to aid in the investigation. An investigation of the truck revealed that two shots had struck the vehicle, one

---

1. "The Commonwealth may only appeal from a pre-trial order if it involves a pure question of law and if it effectively terminates or substantially handicaps a prosecution." *Commonwealth v. DeFelice,* 248 Pa.Super. 516, 522, 375 A.2d 360, 363 (1977). In the instant case, the Commonwealth meets these requirements. First, the Commonwealth appeals from an order finding that a warrantless search was not justified by consent or exigent circumstances. Second, the Commonwealth alleges and the record supports the fact that the evidence suppressed is the only link between appellee and the incident in question in this case.

2. Because we find that the search was justified by exigent circumstances, we do not address the question of consent.

broke a rear window and hit Brian McFarland, the other hit the truck's tailgate. Trooper Dibler concluded from his observations that the weapon used was a .243 caliber rifle.

The troopers then went to interview another witness who lived about one-half mile from appellee. This witness, Simon Summers, told the troopers that he heard the victim's truck proceed up the road in the area of appellee's residence and that shortly thereafter he heard five shots fired from that area.

The troopers then decided to interview appellee and proceeded to his residence after requesting and receiving additional assistance. They arrived at the home at about 2:30 a.m. Trooper Dibler testified that as they arrived at the house they observed that it was the only one with lights on in the nearby area. Trooper Balaska testified that they knew appellee, Robert Hinkson, had a wife and several children, but had no further information about them.

The troopers then deployed themselves around the house and requested over a P.A. system that appellee come out of his house. Within fifteen to thirty seconds, appellee came out of the house with his hands on his head. Two troopers led appellee away from the house and informed him of his constitutional rights. Appellee stated he wished to have an attorney, and there was no questioning by the police.

At this point, Trooper Balaska went up to the house and knocked on the front door. When appellee's wife came to the door, the trooper identified himself and asked if everyone in the house was okay. Mrs. Hinkson then invited the trooper into the residence. Once inside, the trooper informed Mrs. Hinkson that he was there as a result of shots being fired and asked if there were any guns in the house. Appellee's 15-year old son answered "yes" and asked the trooper if he would like to see them. The trooper said yes and followed the son through various rooms in the house, including appellee's bedroom, from which various guns and bullets were collected.

At the time of this search, Trooper Balaska did not know exactly what crime had been committed or what had occurred concerning the three reported but unaccounted for shots. The trooper considered the possibility based on his experience and knowledge of these types of incidents that someone was held hostage or hurt in the house and his initial primary purpose in entering the house was to see whether anyone else was hurt.

The relevant result of the search was a .243 caliber rifle, five spent cartridges, and a box of live .243 shells. The officer examined the gun and spent shells and concluded from the strong odor of gun powder that the gun and shells had been recently fired. This evidence, along with a statement by the son that the .243 caliber rifle and shells belonged to the defendant, was suppressed by the court below.

We initially note that "[a]s a general rule a search or seizure without a warrant is deemed unreasonable for constitutional purposes. *Coolidge v. New Hampshire*, 403 U.S. 443, 454, 91 S.Ct. 2022 [2031], 29 L.Ed.2d 564." *Commonwealth v. Holzer*, 480 Pa. 93, 102, 389 A.2d 101, 106 (1978). However, the realities and practicalities of law enforcement dictate that where exigent circumstances exist, the warrant requirement is excused. *United States v. Velasquez*, 626 F.2d 314 (3rd Cir.1980); *Holzer*, supra. Exigent circumstances arise where the need for prompt police action is imperative, either because evidence is likely to be destroyed, *id.*, or because there exists a threat of physical harm to police officers or other innocent individuals. *Velasquez*, supra.

An inquiry to determine whether exigent circumstances exist involves a balancing of the individual's right to be free from unreasonable intrusions against the interest of society in investigating crime quickly and adequately and preventing the disappearance of evidence necessary to convict criminals. *United States v. Rubin*, 474 F.2d 262 (3rd

Cir.1973), cert. denied 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); *United States v. Hayes,* 518 F.2d 675 (6th Cir. 1975). It requires an examination of all of the surrounding circumstances in a particular case, *Commonwealth v. Harris,* 429 Pa. 215, 239 A.2d 290 (1966). These circumstances will vary from case to case and the inherent necessities of the situation at the time must be scrutinized." *Rubin,* at 268.

■ Before we decide whether exigent circumstances were present in the instant case, we must first determine if probable cause, for a search existed.[3] The police officers in the instant case knew the following: that a man had been shot in front of appellee's residence; that appellee had a reputation for using a gun and thus that there were probably firearms in the house; that five shots had been fired, of which only two had been accounted for; that other family members lived in the house; and that at 2:20 a.m., appellee's residence was the only one in the area with lights on. We conclude that under these circumstances probable cause to search clearly existed in this case.

■ Thus, we now move to a consideration of whether exigent circumstances existed. For the reasons that follow herein, we conclude that the warrantless search in the instant case was justified by the existence of exigent circumstances. We reach this conclusion for two reasons.

First, we find that the police reasonably concluded that someone in the house could have been held hostage or have been hurt. See *United States v. Jones,* 635 F.2d 1357 (8th Cir.1980). When the officer entered the house, he knew that three of the five reported shots were unaccounted for. We also note that while the officer did have probable cause to believe that someone in the house had fired the shots, he could not be certain that that person was appellee.

**3.** Probable cause is, of course, a prerequisite to any search. *Commonwealth v. Pinno,* 433 Pa. 1, 248 A.2d 26 (1968).

The officer did, in fact, testify that at the time he approached the house, he was not convinced that it was appellee who had fired the shots. Also, he testified that based on his experience he knew that in this type of situation, family members are sometimes injured or held hostage; and that despite Mrs. Hinkson's response to his question, he remained concerned that somebody in the house might be hurt.

We conclude that such continuing concern of the officer was reasonable under the circumstances; a prudent policeman would certainly have had to consider the possibility that Mrs. Hinkson was under duress or simply attempting to protect her husband. Thus, even though appellee was outside the house, police had to consider the possibility that someone in the house was injured or that a hostage situation existed. We find that these circumstances were exigent and therefore justified the warrantless search.

Second, we find that the police acted properly in order to protect the public safety. See *Jones,* supra. As we noted above, a man had already been shot outside the house and the police could not be certain of who in the house had fired the shots. For the police to have delayed action while a search warrant was obtained would have unduly risked the lives of the public and the troopers.[4]

Since we find that the warrantless search was justified by exigent circumstances, we must reverse that part of the order below which suppressed the physical evidence and the statement of Robert Hinkson, Jr. as to his father's ownership of the .243 caliber rifle and used and unused shells.[5]

Order reversed.

4. Trooper Dibler testified that in his opinion it would have taken about three and a half hours to obtain a search warrant.

5. The only apparent ground for suppressing the statement of Robert Hinkson, Jr. was as fruit of an unlawful search. Since we have found the search to have been lawful, the statement should not be suppressed.