Sylvester J. SCHIEBER and Vicki A. Schieber, as Co–Personal Representatives of the Estate of Shannon Schieber, Sylvester Schieber and Vicki Schieber

v.

CITY OF PHILADELPHIA, Steven Woods, individually and as a Police Officer, and Raymond Scherff, individually and as a Police Officer

No. 98–5648.

United States District Court, E.D. Pennsylvania.

May 9, 2001.

David Rudovsky, Kairys & Rudovsky, Philadelphia, PA, Anne L. Milem, Marc L. Fleischaker, Nancy S. Appel, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for Sylvester J. Schieber, Vicki A Schieber, As Co–Personal Representatives of the Estate of Shannon Schieber; Sylvester Schieber; Vicki Schieber, Plaintiffs.

Jeffrey M. Scott, City of Philadelphia—Law Dept., Peter D. Winebrake, Shelley R. Smith, Philadelphia, PA, for City of Philadelphia, Steven Woods, Individually and as a Police Officer, Raymond Scherff, Individually and as a Police Officer, Defendants.

## MEMORANDUM AND ORDER

SHAPIRO, Senior District Judge.

Plaintiffs Sylvester and Vicki Schieber, as Administrators of the Estate of Shannon Schieber, and individually as her parents, together with Sean Schieber, Shannon's brother,[1] filed an action asserting civil rights violations and state law claims against the City of Philadelphia and individual police officers, Steven Woods ("Woods") and Raymond Scherff ("Scherff"). On July 9, 1999, the court denied defendants' motion to dismiss.[2]

---

1. Sean Schieber was dismissed as a party to this action on July 9, 1999.

2. The court granted defendants' motion to dismiss plaintiffs' state law claim for negligent and intentional infliction of emotional distress, but denied the motion as to the remaining counts.

*Schieber v. City of Philadelphia,* No. Civ. A. 98–5648, 1999 WL 482310 (E.D.Pa. July 9, 1999). On November 7, 2000, the court granted in part and denied in part defendants' motion *in limine* to preclude the testimony of Dr. Michael M. Baden, a forensic pathologist, that Shannon Schieber ("Schieber") was alive when Officers Scherff and Woods responded to the Emergency 911 call. *Schieber v. City of Philadelphia,* No. Civ. A. 98–5648, 2000 WL 1670888 (E.D.Pa. Nov.7, 2000). On December 13, 2000, the court granted in part and denied in part defendants' motions *in limine* to preclude the testimony of a future lost earnings expert, two police practices experts and an FBI Special Agent. *Schieber v. City of Philadelphia,* No. Civ. A. 98–5648, 2000 WL 1843246 (E.D.Pa. Dec.13, 2000). Defendants have now moved for summary judgment.

## FACTS

Plaintiffs alleged that on May 7, 1998, at 2:00 a.m., Shannon Schieber screamed for help as she was attacked in her apartment; a neighbor called the police for assistance. Compl. at ¶ 1. In response to the "Priority 1"[3] emergency call, Officers Woods and Scherff arrived at Schieber's apartment building where the neighbor stood ready to assist. Compl. at ¶ 2. The police officers observed the balcony door to her apartment was closed and the apartment was dark. Compl. at ¶ 30. They knocked on Schieber's front door; receiving no answer, they made no further inquiry. Compl. at ¶ 2. They did not attempt to enter Schieber's apartment. Compl. at ¶ 2.

The officers did not call for assistance to break down the door or seek advice on whether to do so. Compl. at ¶ 33. Officer Woods admitted he would have called a

supervisor had he known the call was in response to a woman screaming. Compl. at ¶ 34. Officer Scherff would not have forced entry unless he himself heard the screams. Compl. at ¶ 34. Neighbors, having been assured by the officers that Schieber was not home and told by the officers to call 911 again if they heard any other noises from the apartment, took no further action; whether they would have taken action otherwise is disputed. The following afternoon, Schieber's brother and a neighbor broke into Schieber's apartment and found her dead. Compl. at ¶¶ 40, 69.

## DISCUSSION

### A. *Standard of Review*

Summary judgment is appropriate if there are no genuine issues of material fact and the evidence establishes that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A defendant moving for summary judgment bears the initial burden of demonstrating that there are no facts supporting the plaintiff's claim; then the plaintiff must introduce specific, affirmative evidence there is a genuine issue of material fact. *See id.* at 322–24, 106 S.Ct. 2548. The non-movant must present evidence to support each element of its case for which it bears the burden at trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must draw

---

**3.** Emergency 911 calls are classified from 0–6 in order of priority. A "Priority 1" call is the highest classification for a civilian in need of assistance. Compl. at ¶ 28.

all justifiable inferences in the non-movant's favor. *See id.* at 255, 106 S.Ct. 2505.

### B. *Parental Standing*

▇▇▇ Defendants have renewed their objection to Schieber's parents' right to recover; this issue was decided upon denial of defendants' motion to dismiss. *Schieber v. City of Philadelphia*, No. Civ. A. 98–5648, 1999 WL 482310, *2 (E.D.Pa. July 9, 1999). Parents of a minor child have a liberty interest in that child's life because of the parents' interest in custody and maintenance of the family. *See Estate of Bailey v. County of York*, 768 F.2d 503, 509 n. 7 (3d Cir.1985)(overruled on other grounds); *Schieber*, 1999 WL 482310 at *2. It is uncertain whether parents of an independent adult child have such an interest.[4] *See Freedman v. City of Allentown*, 853 F.2d 1111, 1117 n. 5 (3d Cir.1988); *Schieber*, 1999 WL 482310 at *2.

In *Estate of Bailey*, the Third Circuit relied on *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir.1984), in which a parent of a child who died as a result of unlawful state action was permitted to maintain a § 1983 action for deprivation of a liberty interest. The *Bell* court acknowledged a father's cognizable liberty interest in the custody of his child and the maintenance and integrity of the family. *See id.* at 1245–46. *Bell* recognized an "interest in the companionship, care, custody, and management" of the children, interests that do not change based on the age of the child. *Id.* at 1244–45. The *Bell* court refused to except an adult child; the child's age and dependence upon the par-

ents are factors a jury could consider in determining the amount of damages. *See id.* at 1245.

It is likely the Third Circuit would continue to follow the *Bell* decision. *See Estate of Bailey*, 768 F.2d at 509 n. 7; *McCurdy v. Dodd*, No. Civ. A. 99–5742, 2000 WL 250223 (E.D.Pa. Feb.28, 2000)(father was permitted to proceed on § 1983 claim for loss of companionship of his child, without reference to child's age); *Estate of Cooper v. Leamer*, 705 F.Supp. 1081, 1087 (M.D.Pa.1989)(parents could recover loss of interest in son's life regardless of age and residential status); *Agresta v. Sambor*, 687 F.Supp. 162, 164 (E.D.Pa.1988)(parents stated cause of action under § 1983 despite age and marital status of son). Schieber's parents have an actionable liberty interest in the life of their daughter.

### C. *Causation*

▇▇▇ Section 1983 "creates a species of tort liability." *Heck v. Humphrey*, 512 U.S. 477, 483, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); *Hector v. Watt*, 235 F.3d 154, 155 (3d Cir.2000). Under the Pennsylvania common law of torts, the defendant's conduct must be a "substantial factor" in producing the injury. *Vattimo v. Lower Bucks Hosp., Inc.*, 502 Pa. 241, 465 A.2d 1231, 1233 (1983).

▇▇▇ Defendants contend plaintiffs have not proved that Schieber was alive when the officers arrived.[5] They reject the testimony of Dr. Michael M. Baden ("Ba-

---

4. Neither is it certain that Schieber was entirely "independent" at the time of her death. She was a 23 year old full-time graduate student when she was murdered.

5. In the July 9, 1999, Memorandum and Order granting in part and denying in part defendants' motion to dismiss this action, the court recognized that, "[i]t may be that plain-

tiffs' cause of action cannot survive a motion for summary judgment for lack of evidence Shannon Schieber was still alive when the officers responded to the emergency call." *Schieber v. City of Philadelphia*, Civ. No. 98–5648, 1999 WL 482310, at *4 (E.D.Pa. July 9, 1999).

den"), a forensic pathologist retained by plaintiffs who will provide medical testimony as to time of death. The court has determined that: (1) Baden qualifies as an expert under the *Daubert* criteria; and (2) his testimony regarding the time of death is admissible.[6] Whether Schieber was alive when Officers Scherff and Woods were at her apartment and failed to enter is a disputed issue of material fact for a jury to determine.

Defendants also argue that even · if Schieber were alive when the officers arrived, her assailant's decision to kill her was an independent, unpredictable act for which the officers cannot be held liable. A jury must determine whether the officers' conduct in response to the 911 call (their failure to intervene and their instruction dissuading others from undertaking private rescue) was a substantial factor causing Schieber's death. *See Vattimo,* 465 A.2d at 1234("the determination of whether the defendant's conduct was a substantial cause of the injuries complained of should not be taken from the jury if the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm."). Summary judgment will be denied for this reason.

### D. § 1983 Liability of Individual Defendants

 Plaintiffs claim the individual defendants violated Schieber's Fourteenth Amendment Due Process rights by refusing to make a forcible entry to save Schieber's life. Ordinarily, a state actor has no affirmative obligation to protect a person from injuries caused by others. *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 195–96, 109 S.Ct. 998, 103

L.Ed.2d 249 (1989)(state not liable for injury to young child while in his father's custody even if on notice of likelihood of severe injury). However, there is an exception for a "state-created danger." *See id.* at 201, 109 S.Ct. 998. If a state actor creates the danger causing harm, the individual harmed may recover. *See Kneipp v. Tedder,* 95 F.3d 1199, 1205, 1211 (3d Cir.1996). *See also Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 907 (3d Cir. 1997); *Cannon v. City of Philadelphia,* 86 F.Supp.2d 460, 465 (E.D.Pa.2000)(Brody, J.).

 A plaintiff must prove four elements to recover for harm from danger created by the state: (1) the harm caused was foreseeable by the state actor and fairly direct; (2) the state actor's conduct "shocks the conscience;" (3) there existed some relationship between the state and the plaintiff; and (4) the state actor used state authority to create an opportunity that otherwise would not have existed for the harm to occur. *Kneipp,* 95 F.3d at 1208; *Mark v. Borough of Hatboro,* 51 F.3d 1137 (3d Cir.1995).

### 1. Foreseeable and Direct Harm

If Schieber were alive and her assailant still in the apartment house when Officers Scherff and Woods arrived at the apartment house, Schieber's death was a foreseeable and direct harm resulting from their inaction. *But see White v. City of Philadelphia,* 118 F.Supp.2d 564, 570 (E.D.Pa.2000)(based on neighbors' allegations they heard screaming and a dog barking from decedent's apartment, "it was not foreseeable that failure to respond to screaming would result in murder.").

---

6. Defendants' motion *in limine* to preclude Baden's testimony was granted in part and denied in part by Memorandum and Order dated November 7, 2000. *See Schieber v. City of Philadelphia,* No. Civ. 98–5648, 2000 WL 1670888, at \*3–4 (E.D.Pa. Nov.7, 2000).

### 2. Mens Rea

■ The standard for liability is conduct that "shocks the conscience." *See County of Sacramento v. Lewis*, 523 U.S. 833, 847, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)(police officers held not liable for the death of a suspect they pursued in a high-speed chase because the officers did not intend to harm the suspects; their conduct did not "shock the conscience.")(quoting *Collins v. Harker Heights*, 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)); *Miller v. City of Philadelphia*, 174 F.3d 368, 376 (3d Cir.1999)(social worker's decision to examine plaintiff's children upon a report of suspected child abuse did not shock the conscience). "[B]ecause state-created danger is a subset of substantive due process, *Lewis* and *Miller* require that, in a state-created danger case, the actions of the state actor must shock the conscience to trigger liability." *Cannon*, 86 F.Supp.2d at 469.

■ What "shocks the conscience" depends on the circumstances. *See Miller*, 174 F.3d at 375(" '[d]eliberate indifference that shocks in one environment may not be so patently egregious in another,' and the circumstances of each case are critical.")(internal citations omitted). A key factor is whether the state actors were acting under pressure. *See id.*("A much higher fault standard is proper when a government official is acting instantaneously and making pressured decisions without the ability to fully consider their risks."); *see also Cannon*, 86 F.Supp.2d at 470("in evaluating whether [an] officer's actions shock the conscience, [the judge] must analyze whether the officers ... were acting in a pressurized situation, in-

hibiting their ability to act in a deliberate fashion."). Here, there is no evidence Officers Scherff and Woods were acting in a pressurized situation. A jury could reasonably find that the officers' conduct shocks the conscience.

Viewing the evidence in the light most favorable to the plaintiffs, the officers: (1) responded to a "Priority 1" 911 call reporting a woman screaming; (2) checked the balcony and front door for signs of forced entry; (3) repeatedly knocked on Schieber's door, heard no noises from within; (4) spoke with Parmatma Greeley ("Greeley"), the neighbor who made the 911 call, as well as another neighbor outside Schieber's door; and (5) left the scene within several minutes despite not having to respond to another call. Officer Scherff was also aware of other rapes in Schieber's neighborhood and had those assaults in mind when he responded to the 911 call.

The officers contend they lacked probable cause to force Schieber's door because Greeley was uncertain, equivocated about whether the noise he heard came from within Schieber's apartment or from outside, and stated he would be "embarrassed" if the officers forced the door and found nothing wrong inside.[7] Probable cause "is a flexible, common-sense standard. * * * [I]t does not demand any showing that ... a belief [that what is sought will be found] be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).

■ When home entry is for rescue purposes, the standard is not "probable cause," but "reasonable belief."[8] *See*

---

7. The parties dispute whether Greeley's statement was volunteered by Greeley or in response to improper leading questions by the officers.

8. In their brief in support of their motion for summary judgment on the Section 1983 claim against the City, defendants concede that the "reasonable belief" standard is the appropri-

*Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)("[T]he Fourth Amendment does not bar police officers from making warrantless entries . . . when they reasonably believe that a person within is in need of immediate aid. * * * 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' ")(internal citation omitted); *United States v. Richardson,* 208 F.3d 626, 629 (7th Cir.), *cert. denied,* 531 U.S. 910, 121 S.Ct. 259, 148 L.Ed.2d 188 (2000)(same). *See also Good v. Dauphin County Soc. Servs. for Children and Youth,* 891 F.2d 1087, 1093 (3d Cir. 1989)("The right of the police to enter and investigate in an emergency . . . is inherent in the very nature of their duties as peace officers . . . ."). "[T]he state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat." *Id.* at 1094.

Whether Officers Scherff and Woods had "reasonable belief" to enter and whether they made a principled and rational decision or a quick pressurized decision not to enter depend on disputed material facts.

### 3. *Relationship with the State*

■ There must be sufficient state contact with the plaintiff so the harm from the defendants' acts was foreseeable in a tort sense. *See Morse,* 132 F.3d at 912; *Kneipp,* 95 F.3d at 1209 n. 22. It is not clear that the plaintiff must be a "specific individual [who] has been placed in harm's way" or "part of an identifiable and discrete class of persons subject to harm the state has allegedly created." *Morse,* 132 F.3d at 914. "The ultimate test is one of foreseeability." *Id.*

ate standard for home entry for rescue pur-

■ Officers Scherff and Woods responded to Greeley's "Priority 1" 911 call reporting screaming from Schieber's apartment. Greeley was outside Schieber's door with the officers when they decided to leave rather than force her door. The officers' response, their decision not to force the door, and their instruction to Greeley and other neighbors to do nothing but call 911 if they heard any other noise, created a relationship with Schieber entitling her to protection from foreseeable harm. Their response to the call took responsibility for the rescue from the hands of Schieber's concerned neighbors, and created a special relationship between the officers and Schieber. *See Kneipp,* 95 F.3d at 1209 n. 22; *Henderson v. City of Philadelphia,* No. Civ. 98–3861, 1999 WL 482305, at *10 (E.D.Pa. July, 12, 1999), *aff'd w/o opinion,* 216 F.3d 1076 (3d Cir.2000)("[b]ecause [victim's] injuries resulted from foreseeable harm and because the officers were warned that he may injure himself in precisely the manner he did, [the victim] was clearly a foreseeable victim of the officers' inaction."). *But see White,* 118 F.Supp.2d at 571(victim who was the subject of a 911 call by third parties was not a "foreseeable victim" of defendant police officers' inaction "in a tort sense."). Here, it was foreseeable that the officers' inaction upon responding to the 911 call resulted in the ultimate harm.

### 4. *State Creation of the Opportunity for Harm*

■ In *Kneipp,* the first Third Circuit case to recognize an exception for state-created danger, the police stopped an inebriated couple, allowed the husband to leave, detained the wife but then failed to escort her home; she was found later that night unconscious at the bottom of an em-

poses. *See* Defs.' Br. at 34–35.

bankment. The court found that it was "conceivable that, but for the intervention of the police, [the victim's husband] would have continued to escort his wife back to their apartment where she would have been safe. * * *As a result of the affirmative acts of the police officers, the risk of injury to [the victim] was greatly increased." *Kneipp*, at 95 F.3d at 1209.

In *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902 (3d Cir.1997), a teacher was killed in a day care center located in a public high school. *Id.* at 904. The assailant entered the building through an unlocked entrance; he was later convicted and incarcerated in a psychiatric hospital. *Id.* In an action against the school district for creating the dangerous condition leading to the death, the court found a "dispositive factor" was "whether the state has in some way placed the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act or omission." *Id.* at 915. The plaintiff there did not meet his burden of proving defendants placed the victim in harm's way.

Here, the officers' decision to: (1) leave without forcing Schieber's door; and (2) instruct the neighbors to do nothing but call 911 if they heard additional noise, greatly increased the risk of harm to Schieber by preventing the neighbors from effectuating rescue themselves. The officers placed Schieber in a worse situation than if they had not responded at all. Plaintiffs have produced evidence that it is more likely than not that but for the officers' conduct (failing to force her door and instructing the neighbors to do nothing but call 911 if they heard any additional noise), Greeley would have intervened on Schieber's behalf.[9] As in *Kneipp*, inadequate intervention increased the likelihood of harm. *See Beswick v. City of Philadelphia*, No. Civ. A. 00–1304, 2001 WL 210292, *13 (E.D.Pa. March 1, 2001)(ambulance dispatcher's act of ensuring 911 caller that help was on the way but improperly delaying its arrival put the decedent in a worse position than if the 911 call had never been placed); *Roberson v. City of Philadelphia*, No. Civ. A. 99–3574, 2001 WL 210294, *12 (E.D.Pa. March 1, 2001)(detective's failure to arrest plaintiff's neighbors, for whom he had arrest warrants, coupled with his decision to inform the neighbors of the arrest warrants, created or exacerbated the danger that plaintiff would be assaulted). *Cf. Jones v. City of Philadelphia*, Civ. No. 00–5569, 2001 U.S. Dist. LEXIS 4720 (E.D.Pa. Jan. 9, 2001)(officers not liable for standing by as plaintiff was pulled from a car, sexually assaulted, and robbed because they did not place plaintiff in worse position than if not there at all); *White*, 118 F.Supp.2d at 572 (E.D.Pa.2000)(officers who had responded to a 911 call did not cause decedent's murder by failing to force her door because they "did not exert any control over [the decedent's] environment or interfere with any source of private assistance."); *Henderson*, 1999 WL 482305, at *12(officers not liable for failing to prevent decedent from jumping out the window to his death; although the danger was foreseeable, the officers did not create the danger or use their authority as police officers to

---

**9.** Greeley testified at deposition that the officers' arrival took responsibility for the situation out of his hands; he relied on the officers to do what was necessary in response to his call to 911. *See* Greeley Depo. at 112. There is additional evidence that the officers dissuaded Greeley from taking action by improperly questioning his certainty as to the location of the noises he heard and by asking him how he would feel if they forced her door and found nothing untoward happening inside. *See* Reed Depo. at 31–32, 36; Greeley Depo. at 146.

change the dangers the victim posed to himself).

Summary judgment will be denied on plaintiffs' § 1983 claim against Officers Scherff and Woods.

### E. *Qualified Immunity*

■ The standard for determining whether the affirmative defense of qualified immunity applies is well-established.

First, [a court] must determine if the plaintiff has alleged a deprivation of a clearly established constitutional right. A right is clearly established if its outlines are sufficiently clear that a reasonable officer would understand that his actions violate the right. If a violation exists, the immunity question focuses on whether the law is established to the extent that "the lawfulness of the action would have been apparent to a reasonable official." The status of the right as clearly established and the reasonableness of the official conduct are questions of law.

*Sterling v. Borough of Minersville*, 232 F.3d 190, 193 (3d Cir.2000)(internal citations omitted)(officer not qualifiedly immune for threat to disclose an 18 year old's homosexuality to his grandfather).

■ This court, in its July 9, 1999, Memorandum and Order, determined that Officers Scherff and Woods are not protected by qualified immunity. *See Schieber*, 1999 WL 482310, at *6. "At the time of the alleged violation, the law was clear that police officers are individually liable for due process violations when they have created the danger." *Id.* (citing *Kneipp*, 95 F.3d at 1210). While it was unclear at the time whether the "shocks the conscience" or the "deliberate indifference" standard applied to liability for a state-created danger, the officers' conduct might have violated either standard. *See id.* Reasonable officers would have known that their

decision not to force the door and to tell neighbors to do nothing but call 911 again if they heard further noise did not conform to constitutional standards. *See id.; see also Kneipp*, 95 F.3d at 1210–1211 (police intervention cutting off a private source of rescue and failing to ensure victim's safety after having done so can be the basis for a constitutional claim). *Cf. White*, 118 F.Supp.2d at 575 ("the right to be rescued by the police in response to a 911 call under the facts alleged in the complaint was [not] clearly established under the Fourteenth Amendment;" it was not a right about which a reasonable officer would have known).

Summary judgment will not be granted on the basis of qualified immunity.

### F. *Municipal Liability*

■ "Local governing bodies ... can be sued under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Inadequate police training "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). A municipality may be held liable for a violation of a plaintiff's constitutional rights even where there is no individual liability. *See Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (en banc), *aff'd in part*, 22 F.3d 1296 (3d Cir.1994)("If it can be shown that the plaintiff suffered [an] injury, which amounts to deprivation of life or liberty, because the officer was following a

city policy reflecting the city policymakers' deliberate indifference to constitutional rights, then the City is directly liable under section 1983 for causing a violation of the plaintiff's Fourteenth Amendment rights.").

██ Deliberate indifference is not established by "merely alleging that the existing training program for ... police officers[ ] represents a policy for which the city is responsible." *Canton*, 489 U.S. at 389, 109 S.Ct. 1197. It must be shown that "in light of the duties assigned to specific officers ... the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390, 109 S.Ct. 1197.

██ To sustain their claim against the City, plaintiffs must show: (1) the City's policymakers knew that police officers would have to respond to 911 rescue calls; (2) the response to such calls involves a difficult choice or a history of mishandling by the police; and (3) the wrong choice will frequently cause deprivation of constitutional rights. *See Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir.1999). It is clear that: (1) police officers will routinely be called to respond to 911 rescue calls; (2) the response might involve a difficult question of Fourth Amendment jurisprudence; and (3) the wrong choice will frequently cause a deprivation of a constitutional right.

### 1. *Failure to Train*

██ Plaintiffs allege that the City has failed, with deliberate indifference, to train and supervise its police officers, as a matter of practice and policy. Compl. at ¶ 56.

They further allege that Schieber's death was a direct result of this policy and practice. *See id.* Defendants contend the City's training does not demonstrate deliberate indifference and the purported deficiencies in the training did not cause Schieber's death.

Philadelphia Police Department Directive 7 ("Directive 7"),[10] concerning "Search Warrants," instructs that "[w]arrantless arrests and searches are permitted where exigent circumstances exist." Directive 7, at XI. B. Factors to be considered in determining whether such a warrantless search or arrest may be made include the following:

(1) *the reasonable belief that a threat of physical harm to* police officers or *others exists unless an arrest is made immediately;*

(2) the seriousness of the offense;

(3) a strong reason to believe that the suspect is on the premises AND committed a crime;

(4) the likelihood the suspect will escape;

(5) a "hot pursuit" of a suspect who flees into a building; and

(6) the manner of entry (i.e., peaceable, use of force, trickery, etc.)

*See id.* at XI. B. 1. (emphasis added). This directive instructs Philadelphia Police Officers it is permissible to enter a private home without a warrant if the officer has a reasonable belief that a person inside may be in imminent harm, but such an entry would be for the purpose of making an arrest rather than effectuating a rescue or in response to a 911 Priority 1 call.

Section 2.3(c) of the *Pennsylvania Law Enforcement Handbook*, ("Handbook")[11] is

---

10. This directive is dated September 12, 1994.

11. Larry Holtz, Pennsylvania Law Enforcement Handbook (Gould Publications, Inc.

entitled "Exigent Circumstances." *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) is cited for the proposition that a warrantless search is not justified by exigent circumstances surrounding "the investigation of a serious crime." [12] *See* Handbook § 2.3(c), at 190–191. Note 1 to Section 2.3(c) states:

> Although the (*Mincey*) Court declined to hold that the seriousness of the offense under investigation itself creates exigent circumstances of the kind that justify a warrantless search, it nonetheless did recognize "the right of the police to respond to emergency situations [and to make] warrantless entries and searches when they reasonably believe that a *person* within is in need of immediate aid." [*Mincey,* 98 S.Ct. at 2413.]

*Id.* at 192(emphasis in original). This Note is clear that upon reasonable belief a person is in need of immediate assistance, an officer may enter a private home without a warrant, but it is within a section of the Handbook concerning the exigent circumstances exception to the search warrant requirement.[13]

Two other portions of the Handbook refer to exigent circumstances. Section 2.3(c), in referring to *Commonwealth v. Conn,* 377 Pa.Super. 442, 547 A.2d 768 (1988), cites *Commonwealth v. Hinkson,* 315 Pa.Super. 23, 461 A.2d 616 (1983):

> "[T]he realities and practicalities of law enforcement dictate that where exigent circumstances exist, the warrant requirement is excused." In this respect, "[e]xigent circumstances arise where the need for prompt police action is impera-

tive ... because ... there exists a threat of physical harm to ... innocent individuals."

Handbook § 2.3(c), at 194 (quoting *Hinkson,* 315 Pa.Super. at 27, 461 A.2d 616). *Conn* held that police could not enter a home without a search warrant when the alleged exigent circumstance was the possibility that defendant, having been warned of the arrival of police, would destroy the contraband.

Handbook Section 2.3(c)(2) refers to the exigent circumstance of threat of physical harm to a innocent individual, following the citation of *Commonwealth v. Ehrsam,* 355 Pa.Super. 40, 512 A.2d 1199 (1986)(warrantless entry into defendant's home proper immediately after defendant shot her landlord). This consideration of warrantless entry under threat of immediate physical injury to a third person was in the context of an arrest and search.

Each citation refers to an entry into the home of an alleged criminal defendant for a search or arrest. There is no Handbook reference to warrantless entry into a victim's home in response to a 911 call. In such a situation, the victim is the party with a legitimate expectation of privacy. The " 'capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded space.' " *Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998)(visitors in a home for 2.5 hours for a solely commercial purpose with no prior connection to the homeowner have no pri-

---

1994). Recruits are provided with this publication upon entering the Police Academy. *See* Defs.' Br. at 11–12.

**12.** The "Rationale" section in the Handbook's discussion of *Mincey* describes the search at issue: after an arrest inside the defendant's apartment, in which a narcotics officer was

shot, homicide detectives spent four days searching the apartment without a warrant. *See* Handbook § 2.3(c), at 191.

**13.** The quoted excerpt was extracted from the middle of Note 1.

vacy interests under the Fourth Amendment). The Handbook does not discuss this aspect of warrantless entry.

Philadelphia Police Sergeant Thomas F. O'Connor ("O'Connor"), an instructor at the Philadelphia Police Academy ("the Academy") since October, 1986, teaches a course entitled "Rules of Criminal Procedure." *O'Connor Aff.* at ¶¶ 1–4. O'Connor testified that he teaches that officers "can enter a residence without a warrant if, based on their investigation, they reasonably believe that such action is necessary to prevent a serious injury or save a person's life." *Id.* at ¶ 7. It is unclear from O'Connor's testimony whether this instruction is discussed in the context of the proper response to a 911 rescue call.

O'Connor also testified he teaches a course entitled "Police Radio," in which he "generally" covers the "Check on Well–Being" call. *Id.* at ¶ 10. He instructs that if officers "reasonably believe that the subject of the call is seriously injured or in immediate danger, they may immediately enter the home[, b]ut[ ] in the absence of such a belief, they may not make an immediate entry." *Id.*

Sergeant Larry Clinkscale ("Clinkscale") is also an instructor at the Philadelphia Police Academy and has taught a course called "Search and Seizure." *See* Clinkscale Aff. at ¶¶ 1–2. In this course, Directive 7 is read aloud to the class, with time for questions and commentary. *Id.* at ¶ 5. It is unclear whether the commentary would include discussion of entry for rescue purposes.

Except for Sergeant O'Connor's "Police Radio" course, in which he generally teaches that in response to a "Check on Well–Being" call, officers may enter a home upon reasonable belief that the subject of the call is in immediate danger, defendants have produced no other evidence that the City instructs its officers concerning the proper standards to follow when responding to a rescue call.

Plaintiffs' police practices expert, Walter P. Connery ("Connery"), testified that based upon his review of the Philadelphia Police Department's training materials, the City fails to train its officers adequately regarding home entry for rescue under exigent circumstances. *See Schieber,* 2000 WL 1843246, at *8. He also compared Philadelphia's training materials with those used by Indianapolis and concluded that Philadelphia's were inferior.[14] *See id.* at *9.

The evidence presents a dispute of material fact. A jury could reasonably find that the need for specific training regarding the appropriate response where a police officer is called to a home for a rescue is "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton,* 489 U.S. at 390, 109 S.Ct. 1197. A jury could also find that this failure to train was a substantial factor leading to Schieber's death because Officers Scherff and Woods may have decided to force her door if they had received proper training on this matter.

### 2. *Failure to Inform*

 Plaintiffs also charge the City with violating Schieber's constitutional

---

14. Connery acknowledges that Indianapolis uses the "probable cause" standard rather than the "reasonable belief" standard announced by the Supreme Court in *Mincey* and followed by the Third Circuit. *See* Tr. at 123–24. He concedes that it is a "rather serious mistake," but argues that the Indianapolis materials give a better explanation of the exigent circumstances exception to its officers than do the materials provided to Philadelphia police officers.

rights by failing to link a pattern of crimes to the Center City Rapist.[15] Amended Compl. at ¶ 45(a). If the City had not downgraded two of the four rapes committed in Schieber's neighborhood prior to her rape and murder, officers would have considered the established pattern when responding to the 911 call at Schieber's apartment. Specifically, plaintiffs allege that the City's policy of downgrading crime led to Schieber's death. In support, plaintiffs' expert, Connery, testified that this practice of downgrading had an effect on the handling of rescue calls: because the first two rapes had not been classified as rapes, they were not linked with the subsequent two rapes and this prevented a pattern from emerging. *See* Connery Report at 37–38.[16]

The City does not contend that no police downgrading of crime occurred. Police Commissioner Timoney testified in response to questioning regarding the downgrading controversy that it is his "sense ... that sloppiness and whole host of other things were more responsible than actual intentional downgrading." Timoney Depo. at 111.

■ However, the City argues that Schieber stood in a position no different from anyone else in the community and was not entitled to specific protection. A threat to the general population is excluded from liability as a state-created danger. *See Morse*, 132 F.3d at 913. Liability attaches only when the state actor creates a risk of harm to a definable class of persons. *See id.* at 913–14. "The ultimate test is one of foreseeability." *See id.* at 914.

In *Reed v. Gardner*, 986 F.2d 1122 (7th Cir.1993), an intoxicated driver left by police with keys to an automobile created a danger so evident that liability could attach even if the danger was not to a discrete individual. *Cf. Solum v. Yerusalim*, No. Civ. A. 98–4056, 1999 WL 395720, *5 (E.D.Pa. June 17, 1999)(Shapiro, S.J.)("travelers along Route 1 and their parents" was too broad a class of foreseeable victims for municipal or individual liability to attach).

Plaintiffs do not assert the discrete class of foreseeable victims. If it consisted of young women living within the 1200 by 2000 square feet area in which the crimes allegedly committed by the Center City Rapist took place,[17] this class is distinguishable from the public in general and distinct enough to form a class of foreseeable victims.

Officer Scherff has stated he was aware of other rapes in Schieber's neighborhood and had these assaults in mind when he responded to the 911 call. *See* Scherff Depo. at 33, 36. Officer Woods had responded to a rape in Schieber's neighborhood in August, 1997 and he had heard about similar incidents in the same area from other officers; he did not consider these incidents when responding to Schieber's apartment because he thought the perpetrator had been caught. *See* Woods Depo. at 63–70.

---

**15.** The first two rapes committed by the Center City Rapist were downgraded to "investigation of person." *See Schieber*, 2000 WL 1843246, at *9(discussing Connery's expert report and testimony).

**16.** Connery testified at a *Daubert* hearing on November 6, 2000, that had the first two rapes not been downgraded, they could have been linked up with the second and third rapes to form a serial rapist pattern and "would definitely have an impact on [an officer's] actions." *See* Tr. at 113–114.

**17.** Connery stated at the November 6, 2000, hearing that the area in which the first four rapes occurred were in an area of those dimensions.

It is a question of material fact whether absent the downgrading, these police, linking the four prior rapes allegedly committed by the Center City Rapist to a pattern and a common *modus operandi* in a 1200 by 2000 square feet area, would have acted differently. Whether the downgrading caused the death of Shannon Schieber is a jury question.

Summary judgment will be denied as to plaintiffs' claim against the City.

### G. *Immunity for Pendent State Law Claims Under the Political Subdivision Tort Claims Act, 42 Pa.C.S.A. § 8541 et seq.*

■ Plaintiffs allege both wrongful death[18] and survival[19] claims against the individual officers. Defendants argue they are statutorily immune under the Political Subdivision Tort Claims Act, 42 Pa.C.S.A. § 8541 *et seq.* ("PSTCA"). The PSTCA provides governmental immunity "for any damages on account of any injury to a person ... caused by the act of the local agency or an employee thereof or any other person" with certain exceptions. 42 Pa.C.S.A. § 8541 (West 1998 & Supp.

2000). The eight exceptions listed in § 8542 of the Act are inapplicable here.[20]

However, 42 Pa.C.S.A. § 8550, provides: In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such an act constituted ... actual malice or willful misconduct, the provision of section[ ] 8545[21] ... shall not apply.

42 Pa.C.S.A. § 8550 (West 1998 & Supp. 2000).

■ "[W]il[l]ful misconduct means that the actor desired to bring about the result that followed, or at least that he was aware that it was substantially certain to ensue." *Evans v. Phila. Transp. Co.*, 418 Pa. 567, 212 A.2d 440, 443 (1965)(JNOV denied because jury could have found willful misconduct on the part of a motorman who saw an unusual object on the tracks and failed to stop). *See also Roberson v. City of Philadelphia*, Civ. No. 99–3584, 2001 WL 210294, *15 (E.D.Pa. March 1, 2001)(Shapiro, S.J.)(summary judgment granted in favor of defendant police officers because plaintiffs did not show they intended the

---

**18.** A wrongful death action exists when the "death of an individual [is] caused by the wrongful act or neglect ... of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during [her] lifetime ...." 42 Pa.C.S.A. § 8301(a). Plaintiffs, as Schieber's surviving parents, have standing to bring this action. *See* 42 Pa.C.S.A. § 8301(b).

**19.** A survival action is "the right of action which accrued to the decedent ... as a result of [a] tort." *Walsh v. Strenz*, 63 F.Supp.2d 548, 550 (M.D.Pa.1999). *See also* 42 Pa. C.S.A. § 8302("[a]ll causes of action or proceedings, real or personal, shall survive the death of the plaintiff ....").

**20.** The eight exceptions are: (1) vehicle liability; (2) care, custody or control of personal property; (3) care, custody or control of real

property; (4) dangerous conditions of trees, traffic signs, lights, or other traffic controls, street lights or street lighting systems under the care, custody or control of the local agency; (5) a dangerous condition of utility service facilities owned by the local agency; (6) a dangerous condition of streets owned by the local agency; (7) a dangerous condition of sidewalks owned by the local agency; and (8) the care, custody or control of animals. 42 Pa.C.S.A. § 8542 (West 1998 & Supp.2000).

**21.** Section 8545 confers immunity on employees of local agencies acting "within the scope of [their] office or duties" to the same extent that the local agency itself is immune. 42 Pa.C.S.A. § 8545 (West 1998 & Supp.2000).

beating of the plaintiffs); *Keating v. Bucks County Water & Sewer Auth.,* Civ. No. 99–1584, 2000 WL 1888770, \*14 (E.D.Pa. Dec.29, 2000)(Shapiro, S.J.)(summary judgment denied on defamation claim because defendants' willful misconduct abrogated PSTCA immunity). *But see Renk v. City of Pittsburgh,* 537 Pa. 68, 641 A.2d 289 (1994)(police officer could be indemnified for assault and battery and false imprisonment absent a judicial determination that his acts constituted "willful misconduct;" "willful misconduct" is not necessarily the equivalent of an intentional tort).

■ "Willful disregard" abrogating PSTCA immunity of police officers has been defined as "misconduct which the perpetrator recognized as misconduct and which was carried out with the intention of achieving exactly that wrongful purpose." *Owens v. City of Philadelphia,* 6 F.Supp.2d 373, 394 (E.D.Pa.1998)(summary judgment granted on state law wrongful death claims because plaintiffs did not prove the requisite *mens rea* to abrogate defendants' PSTCA immunity).

For plaintiffs to survive summary judgment on their wrongful death and survival action claims, they would have to produce evidence that Officers Scherff and Woods not only knew that their failure to force Schieber's door was wrong, but that they intended that her assailant, if still inside, would kill her. Plaintiffs have not met this burden. Summary judgment will be granted in favor of defendants on the state law tort claims.

## H. *Conclusion*

Plaintiffs have standing to bring suit on behalf of their adult daughter. Summary judgment will be denied on plaintiffs' Section 1983 claim against the individual officers and the City. Summary judgment will be granted as to plaintiffs' state law claims; defendants are statutorily immune.