**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Michael SANTIAGO, Appellant.**

Superior Court of Pennsylvania.

Submitted June 15, 1999.

Filed Aug. 4, 1999.

Gerald A. Lord, York, for appellant.

Heather A. Moyer, Asst. Dist. Atty., York, For Com., appellee.

Before DEL SOLE, STEVENS, JJ., and CIRILLO, President Judge Emeritus.

STEVENS, J.:

¶ 1 This is an appeal from the judgment of sentence entered in the Court of Common Pleas of York County following Appellant's conviction on the charge of possession with the intent to deliver cocaine. Herein, Appellant contends that the suppression court erred in failing to suppress cocaine seized by the police. We affirm.

In reviewing the denial of a motion to suppress, our responsibility is to determine whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings. If the suppression court held for the prosecution, we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. When the factual findings of the suppression court are supported by the evidence, the appellate court may reverse if there is an error in the legal conclusions drawn from those factual findings.

*Commonwealth v. Lopez,* 415 Pa.Super. 252, 609 A.2d 177, 178–179 (1992) (citation omitted).

¶ 2 Keeping this standard in mind, we find that the relevant facts and procedural history are as follows: At approximately 2:00 a.m., on November 13, 1997, Detective Jeffrey Spence received a dispatch to respond to a shooting death occurring in the 300 block of West Maple Street. Upon arrival, Detective Spence photographed the scene and began investigating the shooting. At some point, Detective Spence went to the police station to review reports generated by other police officers involved in the investigation. For example, Detective Spence reviewed a report written by Detective William Follmer, which indicated that Dennis Banks had witnessed the shooting. Mr. Banks described the shooter as a young Hispanic male with medium complected skin, wearing a blue plaid shirt, jeans, and black boots, standing approximately five feet and ten inches tall, weighing approximately one hundred and eighty-five pounds, and sporting a short hair cut.

¶ 3 Moreover, Detective Spence reviewed a report written by Police Office Figge.[1] From the report, Detective Spence learned that the shooting suspect was a passenger in an old gray Volvo and that the Volvo was registered to Lester Carey of 277 South George Street. The officer's report also indicated that, at 2:56 a.m., Officer Figge found the Volvo parked at the corner of Maple and Duke Streets and that the car's hood was warm, as if it had been driven recently. After reading the report, at approximately 4:15 a.m., Detective Spence telephoned Mr. Carey and asked him to proceed to the police station for questioning. Mr. Carey responded to the detective's request at approximately 4:40 a.m., and told Detective Spence that two men, Solomon Washington and Appellant, had borrowed the Volvo at approximately 10:00 p.m. on November 12, 1997. He also told the detective that Mr. Washington had called him at approximately 2:20 a.m. on November 13, 1997, to report that the Volvo had been returned to Maple Street. Mr. Washington then told Mr.

1. Officer Figge's first name does not appear in the record.

Carey where he lived, which was at 507 South George Street, and gave him directions so that Mr. Carey could retrieve the Volvo's keys. As of the time of questioning by police, Mr. Carey had not retrieved the keys.

¶ 4 After speaking with Mr. Carey, Detective Spence notified Sergeant Roy Kohler, Police Officers Eric Kleynen, Pace, Kelly,[2] and Todd Ross of Mr. Washington's location, asked the men to "pick Mr. Washington up" for questioning in connection with the shooting, gave the officers a description of Appellant, and told the police officers to "be on the lookout" for Appellant.

¶ 5 Upon arrival at 507 South George Street, at approximately 5:30 a.m., Officers Pace and Kelly went to the rear of the residence and Sergeant Kohler and Officers Ross and Kleynen went to the residence's front door. Sergeant Kohler knocked on the door, Mr. Washington and his wife answered it, Sergeant Kohler asked the couple to step outside of the residence since it was dark inside, and they so complied. Sergeant Kohler then asked Mr. Washington who was inside the residence, and Mr. Washington replied that his children were inside. When asked whether anyone else was inside the residence, Mr. Washington responded, "[N]ot that I know of." N.T. 6/25/98 at 27. Mr. Washington was then asked whether the officers could look inside the house, and Mr. Washington responded, "[G]o ahead." N.T. 6/25/98 at 48. The sergeant then turned his attention to Mrs. Washington, who had stepped back inside the house. With the front door still open, Sergeant Kohler walked to the door's threshold, without crossing the threshold in any manner, and saw a Hispanic male of average weight and height, later identified as Appellant, sitting on a sofa approximately ten feet from the inside of the door. Believing that Appellant was armed and dangerous, that he matched the description of the suspect,[3] and noticing that the sofa's cushions were askew, Sergeant Kohler stepped inside the residence, ordered Appellant to the floor at gunpoint, and handcuffed him. As Sergeant Kohler was handcuffing Appellant, Officer Ross also noticed that the sofa's seat cushions were askew and that the right side cushion was raised as if something was under it. Officer Ross raised the cushion further and discovered a loaded handgun. In addition, as Appellant was being handcuffed and Officer Ross was raising the sofa's right cushion, Officer Kleynen, who entered the residence behind Officer Ross and was standing watch, saw a baggie stuffed between the left arm and left cushion of the sofa, which was at the opposite end from where the gun was discovered. As he approached the sofa, but without touching the baggie or disturbing the sofa, Officer Kleynen noticed that the baggie contained a white substance, and, therefore, he seized it. The white substance later tested positive for cocaine.

¶ 6 After seizing the handgun and cocaine, and otherwise securing the room, the officers left the residence and transported Appellant to the police station.[4] At docket number 746 CA 1998, Appellant was charged with possession with the intent to deliver cocaine and, at docket number 722 CA 1998, Appellant was charged with criminal homicide. On April 15, 1998, Appellant filed a pre-trial motion seeking to suppress the cocaine seized by the police, and, on June 8, 1998, an amended motion to suppress was filed. Following a

2. Neither Officer Pace's nor Kelly's first name appears in the record.

3. Appellant was wearing a blue plaid shirt, jeans, and black boots.

4. On November 14, 1997, the police executed a search warrant at 507 South George Street in order to search for clothing belonging to Appellant. As a result of the search, the police seized a black coat and two baseball caps, all belonging to Appellant. The propriety of the search conducted on November 14, 1997, has not been raised in this case, and, therefore, any error with regard thereto has been waived.

suppression hearing, the suppression court denied the motion to suppress and, on September 14, 1998, Appellant proceeded to a bench trial, after which he was convicted of possession with the intent to deliver.[5] Appellant was sentenced to three to six years imprisonment and this timely appeal followed.

¶ 7 Appellant's first contention is that he has standing to challenge the search at issue. In Pennsylvania, defendants charged with possessory offenses have automatic standing to litigate suppression motions. *Commonwealth v. Carlton*, 549 Pa. 174, 701 A.2d 143 (1997). However, although such defendants have standing to file motions to suppress the materials seized by the police:

> they must, as part of their case for suppression, meet the threshold requirement of demonstration of a privacy interest which was actual, societally sanctioned as reasonable, and justifiable in the place invaded....In short, in order for a defendant accused of a possessory crime to prevail in a challenge to the search and seizure which provided the evidence used against him, he must, as a threshold matter, establish that he has a legally cognizable expectation of privacy in the premises which were searched.

*Carlton*, 549 Pa. at 179–180, 701 A.2d at 145–146 (citations and quotations omitted).

¶ 8 Here, from the scant record on the issue, the evidence reveals that Appellant was originally from New York City and that he dated Mr. Washington's stepdaughter, Lois. Apparently, Appellant was an overnight guest in the Washington home during the days preceding the shooting incident, including the evening of November 12, 1997, and into the early morning hours of November 13, 1997. Following Appellant's arrest, the police recovered numerous articles of clothing, which belonged to Appellant, from the Washington home. Based on this evidence, we conclude that Appellant had the requisite privacy interest in the premises, and, therefore, he has standing to challenge the propriety of the search and seizure at issue.[6] *See Commonwealth v. Evans*, 488 Pa. 38, 410 A.2d 1213 (1979) (finding that overnight guest had legitimate expectation of privacy in host's apartment); *Commonwealth v. Rodriguez*, 451 Pa.Super. 474, 679 A.2d 1320 (1996) (holding that where the appellant was an overnight guest at his sister's house, appellant had standing to challenge a search of the premises); *Commonwealth v. Metts*, 447 Pa.Super. 275, 669 A.2d 346 (1995) (*en banc*), *appeal granted in part*, 544 Pa. 255, 675 A.2d 1238 (1996) (finding that where the appellant was an overnight guest for several days and some of his possessions were found there, he had standing).

¶ 9 Having determined that Appellant has standing, we next address the merits of his suppression motion. Namely, whether the cocaine at issue was properly seized by the police. After a thorough review of the record, the parties' briefs, and the applicable law, we conclude that the police had probable cause to arrest Appellant, that exigent circumstances permitted the police to enter Mr. Washington's residence, and that the cocaine was seized pursuant to the plain view doctrine.

¶ 10 It is well settled that the police may make a warrantless arrest if

---

5. Appellant was tried by a jury from January 4–7, 1999, with regard to the homicide charge. He was convicted of first-degree murder and sentenced to a term of life imprisonment on January 7, 1999. This conviction and judgment of sentence are not on appeal before this panel.

6. We note that the Commonwealth argues that Appellant does not have standing because Mr. Washington asked Appellant to leave his home at some time prior to November 12, 1997. However, it appears that either Mr. Washington changed his mind or another member of the Washington household permitted Appellant to remain at the house. As such, we conclude that Appellant was staying at the Washington home with the requisite consent.

probable cause exists. *Commonwealth v. Guzman*, 417 Pa.Super. 364, 612 A.2d 524 (1992). "Probable cause for a warrantless arrest exists if the facts and circumstances within the knowledge of the police officer at the time of the arrest are sufficient to justify a person of reasonable caution in believing the suspect has committed or is committing a crime." *Commonwealth v. Rosario–Hernandez*, 446 Pa.Super. 24, 666 A.2d 292, 295 (1995) (citation omitted). When we examine a particular situation to determine if probable cause exists, we consider the totality of the circumstances, and do not concentrate on each individual element. *See Guzman, supra.* "[We also] focus on the circumstances as seen through the eye of the trained police officer, taking into consideration that probable cause does not involve certainties, but rather the factual and practical considerations of everyday life on which reasonable and prudent men act." *Commonwealth v. Romero*, 449 Pa.Super. 194, 673 A.2d 374, 376 (1996) (quotation omitted). Finally, we note that the "reliability of information provided to police can be verified in a number of ways, including: where the police are able to provide independent corroboration of the information, or where the information is adverse to the individual's penal interest." *Rosario–Hernandez*, 666 A.2d at 295 (citation omitted).

¶ 11 Applying the totality of the circumstances test, and viewing the facts within the knowledge of Sergeant Kohler, the arresting officer, we conclude that probable cause to arrest Appellant existed. Several police officers interviewed witnesses regarding the shooting. Dennis Banks, who witnessed the shooting, told Detective Follmer that the shooter was a young Hispanic male with medium complected skin, wearing a blue plaid shirt, jeans, and black boots, standing approximately five feet and ten inches tall, weighing approximately one hundred and eighty-five pounds, and sporting a short hair cut.

¶ 12 Moreover, Police Officer Figge learned from the witness that the shooter was a passenger in an old gray Volvo. Just blocks from the shooting, and approximately one hour after the shooting, Officer Figge discovered a Volvo with a warm hood matching the description of the subject vehicle. Officer Figge learned that the Volvo was registered to Lester Carey and provided this information to Detective Spence. Detective Spence then contacted Mr. Carey approximately two hours after the shooting and asked him to report to the police station. Mr. Carey responded as requested and, upon questioning, Mr. Carey told Detective Spence that two men, Solomon Washington and Richard Santiago,[7] had borrowed his car approximately four hours before the shooting. Mr. Carey described Richard Santiago as a Hispanic male and Mr. Washington as an African–American male. Mr. Carey also told Detective Spence that Mr. Washington called him approximately twenty minutes after the shooting to report that he had parked the Volvo on Maple Street and that Mr. Carey could retrieve the keys at 507 South George Street, which was Mr. Washington's address. The information concerning Appellant's description, which was obtained from Mr. Banks, and the information concerning the Volvo and Mr. Washington's address, which was provided by Mr. Carey, was relayed to Sergeant Kohler, the arresting officer. Armed with this information, Sergeant Kohler and four other police officers proceeded to 507 South George Street.

¶ 13 Upon arrival at 507 South George Street, Sergeant Kohler was greeted by a man who identified himself as Solomon Washington. Sergeant Kohler asked Mr. Washington if anyone besides his children were inside the home, and Mr. Washington responded, "[N]ot that I know of." N.T. 6/25/98 at 27. The sergeant found this answer to be evasive, and, therefore, he approached the threshold of the opened front door, and, without entering the resi-

7. Appellant used Richard Santiago as an alias.

dence, looked into the interior of the home. It was at this point that Sergeant Kohler saw Appellant, a male fitting the description of the shooter, sitting on the sofa. Sergeant Kohler then entered the residence and arrested Appellant.

¶ 14 Based on the "totality of the circumstances," we conclude that it was reasonable for Sergeant Kohler to conclude that Appellant was the shooter. *See Commonwealth v. Davis*, 418 Pa.Super. 318, 614 A.2d 291 (1992) (holding that where the police were told that a man had a gun at 6054 Irving Street, and the police, who approached the house by walking up the steps to the front porch, saw the appellant with the gun through the opened front door, police were permitted to enter residence to make a warrantless arrest). Viewed objectively, the information provided to the arresting officer, plus Mr. Washington's evasiveness and the fact that Appellant matched the description of the shooter, made it probable that Appellant was involved with the shooting. We note that the information provided to the police was from reliable, identifiable sources and that much of the information was corroborated by the police. *See Rosario–Hernandez, supra.*

[Also,] Appellant has failed to offer, nor are we aware, of any authority which prohibits the use of hearsay, especially in a case, such as this one, where the information was relayed through other police officers. Of necessity, a determination of probable cause, whether by [a] magistrate or by a police officer, will in many cases require the police to rely on information learned from others. It is for this reason that the reliability of individuals providing information is examined. We remind Appellant that the officer need only possess sufficient facts such that a person of reasonable caution would believe that a crime had been committed and that [A]ppellant was involved. In this case, the

arrest of [A]ppellant was supported by an abundance of probable cause.

*Rosario–Hernandez,* 666 A.2d at 296.

¶ 15 Although we have determined that the police had probable cause to arrest Appellant, our inquiry does not end:

[P]robable cause alone will not support a warrantless search or arrest in a residence ... unless some exception to the warrant requirement is also present. It is well settled that, absent consent or exigent circumstances, private homes may not be constitutionally entered to conduct a search or to effectuate an arrest without a warrant, even where probable cause exists. Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries.

*Commonwealth v. Govens,* 429 Pa.Super. 464, 632 A.2d 1316, 1322 (1993) (*en banc*) (citations and quotations omitted). *See Commonwealth v. Arch,* 439 Pa.Super. 606, 654 A.2d 1141 (1995) (holding that in order to enter a dwelling without a warrant to make an arrest, the police must have probable cause as well as an exception to the warrant requirement). In the case *sub judice,* we conclude that the exigent circumstances exception justified the immediate, warrantless entry into Mr. Washington's residence.

The exigent circumstances exception to the warrant requirement recognizes that some situations present a compelling need for instant arrest, and that delay to seek a warrant will endanger life, limb or overriding law enforcement interests. In these cases, our strong preference for use of a warrant must give way to an urgent need for immediate action.

*Govens,* 632 A.2d at 1323 (citations and quotation omitted).

In determining whether exigent circumstances exist, a number of factors are to be considered. Among the factors to be considered are: (1) the gravity of the offense, (2) whether the suspect is reasonably believed to be armed, (3) whether there is above and beyond a clear showing of probable cause, (4) whether there is a strong reason to believe that the suspect is within the premises to be entered, (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended, (6) whether the entry was peaceable, and (7) the time of the entry, i.e., whether it was made at night. These factors are to be balanced against one another in determining whether the warrantless intrusion was justified.

Other factors may also be taken into account, such as whether there is hot pursuit of a fleeing felon, a likelihood that evidence will be destroyed if police take the time to obtain a warrant, or a danger to police or other persons inside or outside the dwelling.

*Commonwealth v. Roland*, 535 Pa. 595, 599, 637 A.2d 269, 270–271 (1994) (citations and quotation omitted).

■ ¶ 16 Applying the said factors to the case *sub judice*, we regard the entry by police into Mr. Washington's home to be proper. First, the crime at issue was one of violence. That is, the police were investigating a violent homicide. *See Govens, supra* (holding that crime of violence should be given great weight in finding exigent circumstances). Second, Sergeant Kohler reasonably believed that Appellant was armed and dangerous. This conclusion is based on the fact that Sergeant Kohler was informed that Appellant was the shooter, contact with Appellant was made only three and one-half hours after the incident, and Sergeant Kohler noticed that the seat cushion next to Appellant was askew as if something were hidden under it. Third, as discussed previously, there was an abundance of probable cause indicating that Appellant was the shooter; the probable cause was based on reasonably

trustworthy information to believe that Appellant committed the homicide. *Govens, supra.* Fourth, since Sergeant Kohler personally observed Appellant sitting on the sofa, there was a strong reason for him to believe that Appellant was in the premises. Fifth, considering the nature of the offense, the fact that Appellant was attempting to conceal his whereabouts by sitting in a darkened room, and the fact that Mr. Washington evasively answered that no one besides his children was in the residence, there was a great likelihood that Appellant would escape if he was not swiftly apprehended. Sixth, the circumstances of the entry of the residence were peaceable. Mr. Washington told the police that they could search his dwelling, Sergeant Kohler then approached the opened front door and simply walked inside upon noticing Appellant's presence. "[T]he fact that [the] entry was not forcible aids in showing the reasonableness of police attitude and conduct." *Govens*, 632 A.2d at 1325 (citations and quotation omitted). Seventh, the time of the entry was made during the early morning hours, when it was still dark outside. "On the one hand, ...the late hour may underscore the delay (and perhaps the impracticability of) obtaining a warrant, and hence serve to justify proceeding without one. On the other hand, the fact that an entry is made at night raises particular concern over its reasonableness...." *Govens*, 632 A.2d at 1325 (citations and quotation omitted). Here, the police were not aware of Appellant's presence at the premises until after their arrival. Furthermore, it was 5:30 a.m., and, as such, we find that the late hour underscored the delay and impracticability of obtaining a warrant. *See Govens, supra* (holding that fact suspect was located at 9:00 p.m. underscored the impracticability of securing a warrant).

¶ 17 With regard to the other factors which may also be taken into account, we conclude that there was a great danger to the police and other persons due to Appellant's presence within the dwelling. If the

police were required to wait for a warrant in order to enter the residence to arrest Appellant, the possibility of a "stand off," Mr. Washington's children being taken hostage, or an armed suspect escaping into the neighborhood was a very real threat. As such, based on all of the aforementioned, we conclude that exigent circumstances existed permitting the police to enter 507 South George Street.

¶ 18 Once within the residence, we find that Officer Kleynen lawfully seized the cocaine at issue pursuant to the plain view doctrine. Under the plain view doctrine, evidence can be seized without a warrant when: "(1) the initial intrusion is lawful—the officer did not violate the Fourth Amendment in arriving at the place from which the evidence is lawfully viewed; (2) the incriminating character of the object is immediately apparent; and (3) the officer has a lawful right of access to the object." *Commonwealth v. Brandt*, 456 Pa.Super. 717, 691 A.2d 934, 938 n. 5 (1997) (citation omitted). *See Commonwealth v. Graham*, 554 Pa. 472, 721 A.2d 1075 (1998).

¶ 19 In this case, as discussed previously, Sergeant Kohler's entry of the Washington residence to arrest Appellant, and Officer Kleynen's subsequent entry to assist, was supported by probable cause, and, therefore, was constitutional under the Fourth Amendment. As such, Officer Kleynen was in a place where he was lawfully permitted to be when he viewed the plastic baggie stuffed between the left arm and left cushion of the sofa. In addition, without disturbing the sofa cushion or the baggie, the incriminating character of the object was immediately apparent in that Officer Kleynen noticed that the baggie contained a white, powdery substance. *See Commonwealth v. Wells*, 441 Pa.Super. 272, 657 A.2d 507 (1996) (holding that where officer saw white powdery substance in baggie, plain view doctrine permitted seizure). Finally, Officer Kleynen had a lawful right of access to the object itself in that the baggie was plainly dis-

played. *See Commonwealth v. McCullum*, 529 Pa. 117, 602 A.2d 313 (1992) (holding that officer had lawful right to tennis shoes since they were in plain view on Appellant's feet). As such, we find that Officer Kleynen lawfully seized the cocaine, and, therefore, that the trial court did not err in failing to grant Appellant's motion to suppress.

¶ 20 For all of the foregoing reasons, we affirm.

¶ 21 Affirmed.

¶ 22 Concurring Opinion By DEL SOLE, J.

DEL SOLE, J., concurring:

¶ 1 I agree with the majority's determination that Appellant had standing to raise the issue of his expectation of privacy.

¶ 2 I also agree that the evidence seized in this case should not have been suppressed. However, in the instant case, the trial court found that the officers entered the home with Mr. Washington's permission. The record supports this finding. Therefore, the majority's discussion of the presence of exigent circumstances is unnecessary.

¶ 3 Accordingly, I concur in the result.