J-S54016-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| LISA ANN PAMPENA | |
| Appellant | No. 1656 WDA 2015 |

Appeal from the Judgment of Sentence October 13, 2015
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0005832-2015

BEFORE: BENDER, P.J.E., OTT, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.:                    **FILED SEPTEMBER 27, 2016**

Lisa Ann Pampena appeals from the judgment of sentence imposed on October 13, 2015, in the Court of Common Pleas of Allegheny County. The trial judge found Pampena guilty of driving under the influence of alcohol (DUI) – general impairment, DUI – highest rate, and endangering the welfare of children.[1] Pampena was sentenced to a term of 90 days in a restrictive intermediate punishment program, and a one-year term of

_____

[1] 75 Pa.C.S. § 3802(a)(1) and § 3802(c) (0.16% or higher) (second offense), and 18 Pa.C.S. § 4304(a)(1), respectively. Pampena was convicted of two counts of each offense. Pampena's blood alcohol level was .300 percent. N.T., 10/13/2015, at 38.

probation. In this appeal, Pampena contends the trial court erred in denying her suppression motion.[2] Based upon the following, we affirm.

The facts underlying this appeal arose on March 13, 2015:

A banging on the preschool's door was alarming to the day care worker, Ms. [Amanda] DeAngelis. The person banging was Ms. Pampena. She was late to pick up her children.[3] That, too, was unusual. They let Ms. Pampena inside. Ms. DeAngelis immediately noticed glassy eyes, a red face, and the smell of alcohol. Her voice was different according to her children. Something was not right. The children wanted to stay. [Pampena] would have nothing of that. She ushered them out of the building despite Ms. DeAngelis' efforts to prevent it. Ms. Pampena drove away. Police were called. …

****

A known person, Ms. DeAngelis relayed her observations to dispatch who then tells the officer "that a person was intoxicated while picking up their children from daycare and left." [4] A vehicle description is given as well as the name of the driver and her address. Sgt. [Sam] Snyder goes to that address.[5] He beats her there. The house is dark. Seeing nothing he is leaving the housing development. At a stop sign, he sees a car. It matches the description given. He turns his car around and follows. By

_____

[2] Pampena's suppression motion sought to challenge "up to the arrest of Ms. Pampena [and] intoxilyzer results after that." N.T., 10/13/2015, at 3; **see also** Pampena's Omnibus Pretrial Motion to Suppress Evidence, 10/6/2015.

[3] The affidavit of probable cause states the children were "age 5." Affidavit of Probable Cause, 3/17/2015, at 2.

[4] The record reflects that Ms. DeAngelis called her supervisor, who called 911. **See** N.T, 10/13/2015, at 7; Affidavit of Probable Cause, 3/17/2015, at 2.

[5] Sergeant Snyder testified that this event occurred at 6:30 p.m. **See** N.T., 10/13/2015, at 28.

the time he gets to [the address] in Franklin Park, the car is "backing into the driveway". He parks his police car. He walks down the driveway toward the garage. It was open. The car, however, is not in one of the two stalls a car would normally park in a 2 car garage set-up. This car was right in the middle. Sgt. Snyder could see Ms. Pampena in the driver's seat. With 22 years of experience as his filter, "she appeared intoxicated. She looked just lethargic and tired and just was wore out." Sgt. Snyder introduced himself and said "we got a call from the daycare center. They were worried about your kids. They said that you were intoxicated." Her reply revealed more than just being tired. Sgt. Snyder noticed an odor of alcoholic beverage coming from her and slurred speech. After her children were allowed to exit the car and get settled in the house, Ms. Pampena was given field sobriety exercises in the garage. She did not pass any of them. Instead, she showed more clues of impairment. At this point, Sgt. Snyder's opinion was she was impaired through the consumption of alcohol to the point of being an unsafe driver. At this point, Ms. Pampena was allowed to make arrangements for her children's care. ….

Trial Court Opinion, 2/17/2016, at 5, 6–7 (record citations omitted).

Pampena was convicted and sentenced as stated above, and this appeal followed.[6]

Pampena's sole issue on appeal challenges the denial of her suppression motion, as follows:

Did the trial court err in denying [Pampena's] motion to suppress where the arresting officer proceeded to [Pampena's] home after receiving information of a 911 call involving an allegedly intoxicated mother who had picked up her children at day care, the officer arrived at [Pampena's] house first, he observed her back the vehicle down the driveway, admitted that he observed no aberrant driving, admitted that there was no vehicle code

_____

[6] Pampena timely complied with the order of the trial court to file Pa.R.A.P. 1925(b) statement, by filing a concise statement on November 12, 2015.

[Pampena] had violated, admitted that once the vehicle was parked in the garage the children were safe, yet proceeded to enter the garage to conduct an investigation and field sobriety tests without a warrant?

Pampena's Brief, at 5.

Our standard of review for a challenge to the denial of a motion to suppress evidence is well settled:

> In reviewing a ruling on a suppression motion, our standard of review is whether the factual findings and the legal conclusions drawn therefrom are supported by the evidence. We are bound by the factual findings of the suppression court supported by the record, but we are not bound by the suppression court's legal rulings, which we review *de novo*. Further, the reviewing court may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the entire record.

***Commonwealth v. Irvin***, 134 A.3d 67, 71 (Pa. Super. 2016) (citations omitted). Moreover, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. ***In re L.J.***, 79 A.3d 1073, 1086 (Pa. 2013).

Here, Pampena argues that the trial court erred in denying her motion to suppress because Sergeant Snyder's entry into her garage "was not supported by probable cause and did not warrant an exception under the exigent circumstances paradigm." Pampena's Brief at 11.

Initially, we note:

> It is well established that "probable cause alone will not support a warrantless search or arrest in a residence ... unless some exception to the warrant requirement is also present.... [A]bsent consent or exigent circumstances, private homes may not be constitutionally entered to conduct a search or to effectuate an

- 4 -

arrest without a warrant, **even** where probable cause exists." ***Commonwealth v. Santiago***, 1999 PA Super 196, 736 A.2d 624, 631 (Pa. Super. 1999) (citations omitted; emphasis in orginal). In ***Commonwealth v. Roland***, 535 Pa. 595, 637 A.2d 269 (Pa. 1994), our Supreme Court explained that "[i]n determining whether exigent circumstances exist, a number of factors are to be considered", such as,

> (1) the gravity of the offense, (2) whether the suspect is reasonably believed to be armed, (3) whether there is above and beyond a clear showing of probable cause, (4) whether there is strong reason to believe that the suspect is within the premises being entered, (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended, (6) whether the entry was peaceable, and (7) the time of the entry, i.e., whether it was made at night. These factors are to be balanced against one another in determining whether the warrantless intrusion was justified.

Other factors may also be taken into account, such as whether there is hot pursuit of a fleeing felon, a likelihood that evidence will be destroyed if police take the time to obtain a warrant, or danger to police or other persons inside or outside the dwelling. Nevertheless, police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests.

***Id***. at 600, 637 A.2d at 270-71 (quotations and citations omitted).

***Commonwealth v. Bowmaster***, 101 A.3d 789, 793 (Pa. Super. 2014).

> An analysis of these factors requires "an examination of all of the surrounding circumstances in a particular case. These circumstances will vary from case to case and the inherent necessities of the situation at the time must be scrutinized."

***Commonwealth v. Fickes***, 969 A.2d 1251, 1255 (Pa. Super. 2009) (citation omitted).

Here, Sergeant Snyder testified at the suppression hearing, as follows:

Q.    So you parked your car, and you got out?

A.     Yes, sir.

Q.     And then what happened next?

A.     I walked down the driveway. From the open - -The garage door was open. It's a two-car garage. She backed into the middle. There were no other vehicles inside there. And I observed the defendant behind the wheel of the car. From my experience she appeared intoxicated. She looked just lethargic and tired and just was wore out.

She opened the door. And I said, "Hello." I said, "I'm Sergeant Snyder with the Franklin Park Police Department. We got a call from the daycare center. They were worried about your kids. They said that you were intoxicated." She said to me, "I'm just very tired." And as she spoke and as I was in the area, I could smell an odor of alcoholic beverage emanating from her.

Q.     Where were you at this time whenever all of this conversation was taking place?

A.     I was outside of the garage door.

Q.     Okay. So after you noticed these clues when you were talking to her, what happened next?

* * * *

A.     I let her get the kids situated and sent upstairs. And I asked for her identification. The more that we interacted, I could - - She was unsteady when she walked. She had - - Again, the odor of alcohol continued. It was definitely coming from the driver. I told her once the kids were upstairs that she appeared intoxicated to me. I was going to give her a field sobriety test.

Q.     Were you inside the garage at this point?

A.     I don't recall if I was at this point.

N.T., 10/13/2015, at 14-15 (emphasis supplied).

Q.     Now, you said you don't remember if you were in the garage or not when you began to smell an odor of alcohol; correct?

A. No. I was outside of the garage. There were parts of our conversation that took place prior to the field sobriety test that I don't recall if I was inside the garage.

Q. So, again, from where I'm standing to where you're sitting now, or less, you tell me, how far away were you from Ms. Pampena?

A. Well, she got out of the car and came a little bit towards me.

Q. And that's when you - -

A. Well, I explained why I was there. Identified myself and said why I was there. And she explained that she was just tired.

Q. And you're in the driveway, right in front of the garage?

A. Yes.

Q. And at some point - - When did you enter the garage? You performed all the field sobriety tests inside the garage; correct?

A. Yes. That's correct.

* * * *

Q. I just want to show you this criminal complaint. It said you had a conversation with her here.

A. Um-hmm.

Q. Said she wasn't drunk, she was tired, worked a lot of hours. And then you asked to see her license.

A. Hold on a second.

Q. See where it says that?

A. This says here, it says, "She said she wasn't drunk, that she was just tired. Worked a lot of hours in the week. When she spoke she slurred her words. I could smell a strong odor of alcoholic beverage coming from her breath," period. Okay? "Then she proceeded to move her children from the car. And then at that time I asked to see her license."

Q.    Are you in the garage when you asked to see her license?

A.    I don't think so. I think I'm still letting her fiddle with the kids, getting them removed from the car.

Q.    But you're not sure? You said I think so?

A.    Yes. I'm not a hundred percent sure. But given the logistics of how that would work.

Q.    And you testified it was dusk, nighttime?

A.    Yes. It was March, and it was about 6:00-ish. Or, I'm sorry, it was 6:30.

*Id.* at 26-28.

Pampena argues that Sergeant Snyder noticed no aberrant driving, testified he could not have cited Ms. Pampena for any violation of the vehicle code, and that the children were safe before entering the garage. Pampena's Brief at 15.    Pampena maintains "his [Sergeant Snyder's] probable cause to investigate further, arguably ended when Ms. Pampena was safely parked in her garage.  Assuming, arguendo, that Officer Snyder was within his rights to walk down Ms. Pampena's driveway, once he believed the children to be safe, his dual purpose for checking on Ms. Pampena had been fulfilled." Pampena's Brief, at 15.

Pampena attempts to compare her case to ***Commonwealth v. Parker***, 619 A.2d 735 (Pa. Super. 1993).  Relying on ***Parker***, Pampena asserts:

The Superior Court of Pennsylvania has held that once an officer has made a valid stop of a vehicle which he has reasonable and articulable grounds to believe has violated the vehicle code, in

order to justify a detention of the suspect beyond issuing a traffic citation, the officer must have specific and articulable facts that, taken together with the reasonable inferences drawn from those facts would reasonably indicate that criminal activity might have been afoot.

Pampena's Brief, at 17. Pampena argues Sergeant Snyder "was obligated to end the detention, under the traffic stop case analysis set forth in *Parker, supra* since he couldn't even issue a traffic citation at the point in the encounter when he testified that he believed the children to be safely in the home." Pampena's Brief, at 21.

We find Pampena's reliance on *Parker* is misplaced. Here, although Sergeant Pampena did not see Pampena commit a motor vehicle code infraction, he arrived at Pampena's home based on the 911-call from a known individual, informing police that Pampena was driving home drunk from the daycare facility and had her children with her. At Pampena's residence, he was able to corroborate those details: Pampena was driving the vehicle described; she arrived at her home as expected; her children were with her; and, when he looked into the garage, she appeared to him to be intoxicated based on her lethargic, tired, and worn out demeanor. From the driveway, Sergeant Snyder explained to Pampena why he was there and, as Pampena came closer to him and responded, he could smell alcohol on her breath and hear her slurred speech.

Sergeant Snyder had the right to walk down the driveway for purposes of a police investigation. The United States Supreme Court has explained:

A license may be implied from the habits of the country, notwithstanding the strict rule of the English common law as to entry upon a close. We have accordingly recognized that the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds. This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do.

*Florida v. Jardines*, 133 S. Ct. 1409, 1415-16 (2013) (citations and quotation marks omitted, emphasis added). *See also Commonwealth v. Eichler*, 133 A.3d 775, 784 (Pa. Super. 2015) ("police officers have the authority to enter the curtilage for the purpose of conducting an investigation") (citation omitted). Furthermore, as the trial court correctly points out, in *Commonwealth v. Simmen*, 58 A.3d 811, 815–816 (Pa. Super. 2012), this Court has held that driveways to private residences are not curtilage where an individual has an expectation of privacy. *See* Trial Court Opinion, 2/17/2016, at 3 n.1.

In analyzing the facts of this case, the trial court was guided by *Commonwealth v. Fickes, supra*, 969 A.2d 1251 (Pa. Super. 2009), and found that, under the factors set forth in *Commonwealth v. Roland, supra*, 637 A.2d 269 (Pa. 1994), the warrantless entry into the garage was justified. The Honorable Joseph K. Williams, III, opined:

… [T]he *Fickes* facts are closer to the present situation.

- 10 -

In 2007, local police from Westmoreland County got a "hit-n-run" call. **Fickes**, 969 A.2d at 1253. Officers go to the scene. A witness tells them there was a crash and he saw a silver, rounded sedan or coupe backing away from a parked car it hit. Observational clues led officers on a particular route of travel. Along the way, a stop sign was knocked down by a car. The journey continued. However, the clues stopped. Officers doubled back. They decided to check out an apartment complex. Once there, an officer saw an open garage door. The interior lights revealed a silver vehicle was inside. This discovery was 37 minutes after the initial call was made. From outside the garage, the officer saw wet tire tracks leading into the garage. He heard the ticking sound of a cooling engine. He saw that this garage was not the ordinary receptacle for cars to park but more akin to "party headquarters". 969 A.2d at 1253. A couch was pinned between the front of the vehicle and garage wall and a second couch was leaning on the hood of the car. Some front end damage was noticed but its extent could not be ascertained. The officer knocked on the door of the abutting apartment. There was no answer. He walked into the garage and knocked on another door which led from the garage to the apartment. Again, no response. He then looked at the vehicle. The windows were heavily tinted. He opened the car door. A strong odor of alcohol hit him. Mr. Fickes was passed out and slumped over in the driver's seat. He was not alone. An open bottle of vodka was his passenger. Several attempts to rouse Mr. Fickes from his slumber were not successful. Mr. Fickes finally awoke when the officer was physically hauling him out of the car. He was arrested and taken to a hospital for a blood draw. A little over 2 hours after the initial call, a blood sample was taken. It showed a BAC of .17. **Id.**, at 1254. From these facts, the **Fickes** court reviewed the aforementioned [**Roland**] factors and concluded that the officer had probable cause to arrest for DUI and "that an exigency existed to justify [the officer's] warrantless entry into [Mr. Ficke[s']] garage." 969 A.2d at 1259.

Using this same analytical construct, this Court reaches the same conclusion. The officer had probable cause to arrest for DUI and child endangerment and that a sufficient exigency was present to justify the officer's warrantless conduct.

… This was not the DUI situation as in **Fickes**.  This was was **Fickes** with something extra. … Suffice it to say, the gravity of

- 11 -

the offense was high. *Fickes*, 969 A.2d at 1258 ("while a DUI offense is a misdemeanor, ..., it is one of the few, ... that results in over 500 deaths per year. [citation omitted]. Of course, we gravely view an offense with such deleterious effects. Consequently, we conclude that the gravity of the offense was high.").

The second factor concerns danger. Not only danger to the officer, but also to other members of the community. It is beyond debate that an impaired driver not only puts herself in danger, but the passengers she is transporting, the responding police officers and any other driver on the road at that time. There is no question that Ms. Pampena was impaired when she came to pick up her young children at preschool.[4] She created a zone of danger.

_____

[4] The Court recognizes that Sgt. Snyder held no present belief that Ms. Pampena was "armed". However, the Court views the second factor of [*Roland*] more broadly than an armed suspect's dangerousness just to the police officer.

_____

The level of probable cause was clearly present. A known person, Ms. DeAngelis relayed her observations to dispatch who then tells the officer "that a person was intoxicated while picking up their children from daycare and left." A vehicle description is given as well as the name of the driver and her address. Sgt. Snyder goes to that address. … He walks down the driveway toward the garage. It was open. … Sgt. Snyder could see Ms. Pampena in the driver's seat. With 22 years of experience as his filter, "she appeared intoxicated. She looked just lethargic and tired and just was wore out." Sgt. Snyder introduced himself …. Her reply revealed more than just being tired. Sgt. Snyder noticed an odor of alcoholic beverage coming from her and slurred speech. After her children were allowed to exit the car and get settled in the house, Ms. Pampena was given field sobriety exercises in the garage. She did not pass any of them. …

Without question, the fourth factor tilts the Commonwealth's way. Sgt. Snyder knew the suspect would be inside the garage because he had visual and oral contact with her from his lawful vantage point in the driveway.

The fifth suggested factor is the prospect of escape. The circumstances presented to Sgt. Snyder did not in any way, shape or form suggest an imminent flight by Ms. Pampena.

The entry into the garage was peaceful. Sgt. Snyder's primary concern was not to alarm the young children because of their parent's criminal conduct. His demeanor and tact were exemplary and could serve as a model for other officers on how to accomplish your law enforcement agenda without unnecessary human shrapnel.[7] The fact that entry was made at dusk, when considering all the other circumstances, does not push the Court to find that entry into the garage was other than peaceful.

In summary, the [*Roland*] factors show this warrantless entry was reasonable. That is the ultimate touchstone when dealing with a search and seizure issue that implicates either the 4th Amendment or Article 1, Section 8 of our Commonwealth's constitution.

Trial Court Opinion, 2/17/2016, at 4–7.

We agree with the trial court's reliance on *Fickes* and its analysis of the *Roland* factors. The *Parker* case, and related cases cited by Pampena, are inapposite. As such, we find no basis upon which to disturb the trial court's decision denying Pampena's suppression motion. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

_____

[7] The trial court also noted at the suppression hearing that Sergeant Snyder "could have stopped [Pampena] on the street. I believe what the officer was doing was trying to let her have as much opportunity as she could to get those kids in the house safely." N.T., 10/13/2015, at 37.

- 13 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>9/27/2016</u>